**REVISED JULY 28, 2015**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-30995

United States Court of Appeals
Fifth Circuit

**FILED**
July 28, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

GREGORY McRAE,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, DENNIS, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In the aftermath of Hurricane Katrina, Henry Glover, a civilian, died after an encounter with a New Orleans police officer that left his severely wounded body in a car owned by William Tanner. After Glover died, another officer, Gregory McRae, with the corpse in the car, set it afire. McRae was convicted of four counts, among them violating 18 U.S.C. § 242 and 18 U.S.C § 1519. We affirmed three of the four convictions, including his conviction under section 1519 and remanded for resentencing. On remand, McRae moved for a new trial on the basis of newly discovered evidence. The district court denied the motion. McRae appeals again.

No. 14-30995

After the district court ruled, the Supreme Court announced *Yates* v. *United States*. It is undisputed that by its measure, McRae's charged conduct is not proscribed by 18 U.S.C. § 1519.[1] We must and do vacate his conviction on this count and remand for resentencing. We affirm the district court's denial of McRae's motion for a new trial.

I.

The facts of this case are set out in our first opinion from which we here summarize.

A.

On September 2, 2005, several days after Hurricane Katrina made landfall, New Orleans Police Department ("NOPD") officer David Warren reported for duty.[2] During his patrol, Warren noticed a civilian, Henry Glover, riding a bicycle near an abandoned shopping center. The full nature of their interaction remains a subject of some uncertainty, however, "[a]s to the events that followed, this much is undisputed: Warren shot at Glover with his personal rifle."[3] Glover collapsed and was transported by William Tanner in his car to the nearby Habans Elementary School, where the NOPD had established a temporary base, to obtain medical care for Glover.[4] Tanner, joined by Glover's brother, Edward King, and another man, arrived at Habans with Glover's body in the backseat of the car. The three were detained by NOPD officers, while "[t]he fatally wounded Glover remained silently in the backseat of Tanner's car."[5]

---

[1] 135 S. Ct. 1074, 1088 n.8 (2015).

[2] *See United States* v. *McRae*, 702 F.3d 806, 811-12 (5th Cir. 2012).

[3] *Id.* at 813. Warren testified that he fired a warning shot, and "did not aim anywhere near the man." *Id.* at 812.

[4] *Id.* at 813.

[5] *Id.* at 817.

2

No. 14-30995

During this time, Officer McRae was working in a Special Operations Division stationed at Habans. After Tanner and the other men were detained, "Officer McRae moved Tanner's car to the schoolyard. McRae removed several items from the car, including a gasoline jug, jumper cables, and tools. Later, McRae moved Tanner's car to another area of the school's property. Glover remained in the car, which was to become his coffin."[6] Shortly after, NOPD Captain Jeffrey Winn, who was responsible for McRae's unit, arrived at the scene and ordered McRae and another officer, Dwayne Scheuermann, "to move Tanner's car, with Glover's body, to a more secure location away from the school."[7]

> McRae and Scheuermann left the school in different cars. McRae drove Tanner's car and Scheuermann followed behind in a gray pick-up. McRae arrived at the levee shortly before Scheuermann. He drove Tanner's car over the levee and down a ramp, into an area of trees. He got out of the car, lit a road flare, tossed the flare into the car, closed the driver's side door, and walked away. As McRae walked back up the levee to join Scheuermann in the gray pick-up, he looked back and noticed that the flare was dying out. He walked back closer to the car, drew a pistol, and fired one shot into the car's rear glass. The shot ventilated the car. The car, with Glover's body, began to rapidly burn. The job was complete. McRae retreated to the gray pick-up.
>
> When McRae got into the gray pick-up, Scheuermann asked him why he had set Tanner's car on fire. McRae responded that he "wasn't going to let it rot," referring to Glover's body. At trial, McRae testified that he decided to burn Tanner's car and Glover's body before he left Habans School, and that he made that decision on his own without consulting anyone. He testified that he had seen other dead bodies rotting in the chaotic aftermath of Hurricane Katrina, and that he didn't want Glover's body to suffer the same fate.

---

[6] *McRae*, 702 F.3d at 817-18.

[7] *Id.* at 818.

3

No. 14-30995

Two weeks later, Glover's charred remains were recovered and taken to a temporary morgue. A coroner performed an autopsy on the remains in late October 2005, but they were not identified as those of Glover until April 2006. Glover's family was then able to bury him.[8]

### B.

In 2010, McRae was indicted on five counts. The first three claimed violations of 18 U.S.C. § 242, a federal civil rights statute: that McRae (1) deprived Tanner of the right to be free from an unreasonable seizure; (2) deprived Tanner and King of their civil rights by beating them; (3) denied Glover's descendants and survivors the right to access courts to seek legal redress for a harm. McRae was also charged with (4) obstructing a federal investigation, in violation of 18 U.S.C. § 1519, and (5) using fire to commit a felony, in violation of 18 U.S.C. § 844(h).[9]

As trial preparation began, McRae was seen on a weekly basis by Dr. William B. Janzen, Ph.D, a clinical psychologist. Dr. Janzen, in a report written after McRae's trial had finished, reported that McRae "is clearly evidencing symptoms of a posttraumatic stress disorder [("PTSD")] as a result of his experiences during and after Hurricane Katrina." It is unclear from the record whether or when McRae knew about his diagnosis, though there is a treatment note, dated September 23, 2010, and signed by McRae, where Dr. Janzen wrote that McRae had "delayed PTSD."

### C.

The jury trial began in November 2010. It was prominently covered in the local media and drew the attention of internet commentators. One of those was later discovered to be Sal Perricone, an Assistant United States Attorney in the Eastern District of Louisiana. Although he was not a member of the

---

[8] *Id.*

[9] *Id.* at 811.

McRae trial team, Perricone made numerous anonymous statements, mainly in the online comments section of various NOLA.com articles about the trial.[10] For example, in an article entitled "NOPD officer says she squelched her personal conclusions about the death of Henry Glover," Perricone, using the pseudonym "legacyusa," wrote:

> Let me see if I understand this: The cops, through their attorneys, admitted that they shot Glover and then burned the body in a car that belonged to another man, who was not arrested for anything . . . RIGHT???
>
> Guilty!![11]

Perricone also criticized the performance of the prosecution team, again via online comments that followed NOLA.com articles.[12]  None of these postings identified Perricone by name or employer.[13]

McRae was acquitted on the charge that he beat King and Tanner, but was convicted of all other counts.[14]  "The district court imposed concurrent sentences of 87 months for each of the convictions under 18 U.S.C. §§ 242 and 1519, and a consecutive 120–month sentence for the conviction under 18 U.S.C. § 844(h), for a total of 207 months of imprisonment."[15]

## D.

McRae appealed his conviction.  "We [held] that the evidence is insufficient to support McRae's conviction for denying Glover's descendants and survivors the right of access to courts" and vacated his conviction on that

---

[10] NOLA.com is the website of the *New Orleans Times-Picayune*.

[11] This posting was one of thirty-three separate comments on this article, most by other anonymous commentators.

[12] For example: "My point is simple: the ego of the prosecutor over rode his judgment."

[13] The postings are discussed in more detail in *United States* v. *Bowen*, 969 F. Supp. 2d 546, 589-603 (E.D. La. 2013).

[14] *United States* v. *McRae*, 702 F.3d 806, 818 (5th Cir. 2012).

[15] *Id.* at 811.

count.[16] We affirmed his conviction as to the other three counts.[17] "[B]ecause we [were] unsure of how the district court confected the various sentences as part of the whole," we vacated his entire sentence and remanded for resentencing.[18]

### E.

On remand, McRae moved for a new trial. He pointed to two types of newly discovered evidence that would justify new proceedings. First, he argued that there was new evidence that he was suffering from early stage PTSD, which vitiated the *mens rea* required to sustain his convictions. Second, he posited that Perricone's postings on NOLA.com constituted "an institutional failure that prejudiced [him]."

The district court denied the motion.[19] On resentencing, the court imposed two sentences of 87 months, one for the conviction under 18 U.S.C. § 242 and one for the conviction under 18 U.S.C. § 1519, both to run concurrently, and a third sentence of 120 months for the conviction under 18 U.S.C. § 844(h), which would run consecutively to the first two counts. The total sentence was 207 months in prison.

McRae timely appeals.

### II.

### A.

McRae was convicted of obstructing a federal investigation in violation of 18 U.S.C. § 1519 by burning Henry Glover's body and William Tanner's car. Both sides agree this conviction must be vacated. As do we.

---

[16] *Id.*

[17] *Id. See also id.* at 832-40.

[18] *Id.* at 843.

[19] *See United States* v. *McRae*, No. 10-CR-154, 2014 WL 2468559 (E.D. La. June 2, 2014).

No. 14-30995

Our analysis is controlled by the Supreme Court's recent decision in *Yates* v. *United States*.[20]  There, the Court considered the scope of section 1519, which provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.[21]

At issue there, as here, was the meaning of the term "tangible object."  A four-justice plurality of the Court held "that a 'tangible object' within [section] 1519's compass is one used to record or preserve information."[22]  Justice Alito, concurring in the judgment, did not formally adopt this definition, but concluded that the term "'tangible object' should mean something similar to records or documents."[23]

McRae was convicted of violating section 1519 by "burn[ing] a 2001 Chevrolet Malibu, containing the body of Henry Glover and other evidence, with the intent to impede, obstruct, and influence the investigation of the September 2, 2005, shooting of Henry Glover by a New Orleans Police Department Officer."   Neither a car nor a corpse are "used to record or preserve information" or are "similar to records or documents."[24]  By light of *Yates*, McRae's actions do not violate section 1519.  Indeed, were there any

---

[20] 135 S. Ct. 1074 (2015).

[21] 18 U.S.C. § 1519.

[22] *Yates*, 135 S. Ct. at 1088-89 (plurality op.).

[23] *Id.* at 1090 (Alito, J., concurring in the judgment).

[24] *Id.* at 1088-89 (plurality op.); *id.* at 1090 (Alito, J., concurring in the judgment).

No. 14-30995

doubt, the *Yates* plurality calls out our decision in *McRae*, by name, as a case involving conduct that no longer falls within the ambit of section 1519.[25]

Both McRae and the United States acknowledge that the conviction and sentence imposed under section 1519 must be vacated. As McRae correctly recognizes, however, because he did not object to the scope of section 1519 in the district court, the four-step plain error test applies.

> First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings. Fourth and finally, if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. Meeting all four prongs is difficult, as it should be.[26]

We measure whether the law is clear by looking at the legal landscape as it stands at the time of the appeal.[27] The first two factors are straightforward – after *Yates*, it is beyond dispute that destroying a car and corpse is not criminalized by section 1519. Third, McRae's conviction "affected [his] . . . substantial rights" by increasing his punishment.[28] Finally, because McRae

---

[25] *See id.* at 1088 n.8.

[26] *Puckett* v. *United States*, 556 U.S. 129, 135 (2009) (internal quotation marks, brackets, and citations omitted).

[27] *United States* v. *Escalante-Reyes*, 689 F.3d 415, 418 (5th Cir. 2012) (en banc).

[28] Because section 1519 is an offense of obstruction of justice, the district court applied an enhancement pursuant to U.S.S.G. § 2J1.2. Even if that enhancement had no effect on his sentence, the court imposed a mandatory special assessment of $100 on McRae for his section 1519 conviction. *See* 18 U.S.C. § 3013(a)(2)(A). This assessment is enough to satisfy the third plain error prong. *See United States* v. *Ogba*, 526 F.3d 214, 237 (5th Cir. 2008) (holding that a change in sentence that would alter the special assessment affected the defendant's substantial rights).

No. 14-30995

was convicted of conduct that simply does not violate the statute as currently interpreted, we conclude that it affects the "fairness, integrity, or public reputation" of these proceedings, and exercise our discretion to vacate his conviction for this count.[29]

Because of *Yates*, this appeal – much of which focused either explicitly or implicitly on McRae's section 1519 conviction – has been significantly narrowed.

B.

Next, we turn to the district court's denial of McRae's motion for a new trial, bearing in mind that his arguments are now only relevant for his section 242 and section 848(h) convictions.

Federal Rule of Criminal Procedure 33 allows the district court to "vacate any judgment and grant a new trial if the interest of justice so requires."[30] We review the court's decision to grant or deny a motion for a new trial for abuse of discretion.[31] "[M]otions for new trial are disfavored and must be reviewed with great caution."[32] When, as here, the defendant moves for a new trial based on newly discovered evidence, he must prove each of five prerequisites:

> The defendant must prove that (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal.[33]

---

[29] *See United States* v. *Olano*, 507 U.S. 725, 736 (1993) ("The court of appeals should no doubt correct a plain forfeited error that causes the conviction or sentencing of an actually innocent defendant.").

[30] Fed. R. Crim. P. 33(a).

[31] *United States* v. *Wall*, 389 F.3d 457, 465 (5th Cir. 2004).

[32] *United States* v. *Piazza*, 647 F.3d 559, 565 (5th Cir. 2011).

[33] *Wall*, 389 F.3d at 467. "The defendant is required to prove each element in order to prevail." *United States* v. *Anderson*, 755 F.3d 782, 800 (5th Cir. 2014).

No. 14-30995

1.

McRae's first ground for a new trial is that he has recently discovered "that the clinical psychologist to whom Pretrial Services referred him as a condition of pretrial release has diagnosed him with Post-Traumatic Stress Disorder." This evidence, he argues, would have showed that he "burned Glover's body . . . because of his impaired mental state," not to "cover-up a police shooting." While McRae's mental state was central to his section 1519 charge, requiring *mens rea* to obstruct an investigation,[34] McRae's challenge to this conviction is now moot.

McRae was convicted of violating 18 U.S.C. § 242 by "unreasonably seiz[ing] [Turner's] vehicle (a 2001 Chevrolet Malibu) by burning it without legal justification, thereby willfully depriving [Turner] of the right, secured and protected by the Constitution and laws of the United States, to be free from an unreasonable seizure by law enforcement officers."[35] Section 242 has a "willful" mental state requirement, which means that the prohibited act must have been done "voluntarily and intentionally and with the specific intent to do something the law forbids."[36] However, McRae does not argue that evidence of his PTSD diagnosis would have any relevance to his section 242 conviction.[37]

---

[34] *See, e.g.*, *United States* v. *McRae*, 702 F.3d 806, 835 (5th Cir. 2012) ("[Section 1519] prohibits knowingly destroying evidence 'with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States.'") (quoting 18 U.S.C. § 1519).

[35] R. 268.

[36] *United States* v. *Sipe*, 388 F.3d 471, 479 (5th Cir. 2004); *see also United States* v. *Garza*, 754 F.2d 1202, 1210 (5th Cir. 1985) (recognizing that the Supreme Court has taught "that the term willfully in 18 U.S.C. § 242 implies conscious purpose to do wrong and intent to deprive another of a right guaranteed by the Constitution, federal statutes, or decisional law") (citing *Screws* v. *United States*, 325 U.S. 91 (1945)).

[37] McRae mentions, in a single sentence of his brief, that "[t]o convict, however, the government had to prove 'specific intent to do something the law forbids' for the civil rights charges." The rest of the discussion focuses on whether the new evidence would show that he did not burn Glover's body to cover-up a police shooting. At the district court, McRae

Because an argument not raised at the district court or in the appellant's opening brief is waived,[38] we need not reach this issue.

Regardless, there is no credible argument that the district court abused its discretion in concluding that the new evidence would not "probably produce an acquittal." McRae offers neither evidence nor legal theory to explain how a post-incident diagnosis of PTSD would have negated his mental state on September 2, 2005 for the purposes of his section 242 conviction. Rather, his trial testimony indicates the opposite; McRae testified that on that date, he unequivocally intended to burn Turner's car:[39]

> Prosecutor: You had no intention, when you left that day, of bringing this car or this body back to Habans School?
>
> McRae: I had made a decision before I left Habans that I was going to burn the body in the vehicle.
>
> Prosecutor: You had made that decision before you left Habans School?
>
> McRae: Yes, sir.
>
> Prosecutor: That you were going to burn this car and this body?
>
> McRae: That's correct.
>
> Prosecutor: So before you even left Habans School you had a plan in your mind?
>
> McRae: That's correct.
>
> Prosecutor: To take these flares and light this car on fire?

focused only on the section 1519 mental state argument. There, he argued that he "is entitled to a new trial at which his seemingly brutal, callous and bizarre behavior cannot be urged to have been the first step in a cover-up conspiracy, but rather the early stage of a mental disorder from which he suffers to this day, one recognized by Dr. Janzen, but not made known to defendant until several months post verdict."

[38] *See Cent. Sw. Tex. Dev., L.L.C.* v. *JPMorgan Chase Bank, Nat'l Ass'n*, 780 F.3d 296, 300 (5th Cir. 2015) (arguments not raised before district court are waived); *Flex Frac Logistics, L.L.C.* v. *N.L.R.B.*, 746 F.3d 205, 208 (5th Cir. 2014) (arguments not raised in opening brief are waived).

[39] In the first appeal, McRae argued that burning Turner's car could not constitute a seizure. We rejected that argument on plain error review. *See United States* v. *McRae*, 702 F.3d 806, 833 (5th Cir. 2012).

McRae: Yes, sir.

Prosecutor: And just so that we are clear, when the car went up on fire, that wasn't a mistake?

McRae: No, sir.  That was definitely not a mistake.

Prosecutor: That was something intentional?

McRae: Yes.

A few minutes later, McRae confirmed that he knew the vehicle did not belong to him and knew that its destruction was legally prohibited:

Prosecutor: And it's your statement that you planned to just go and burn the car from, I believe you said, the moment before you left.  That was your plan?

McRae: Yes.

Prosecutor: To take this functioning 2001 Chevrolet Malibu and light it on fire?

McRae: Sir, that car was meaningless to me.  That car was nothing to me.

Prosecutor: Well, I realize that.  You burned the car, correct?

McRae: That's correct.

Prosecutor: Notwithstanding the fact that [New Orleans] had shortages of vehicles, correct?

McRae: Right.

Prosecutor: Notwithstanding the fact that this vehicle belonged to somebody, correct?

McRae: That's correct.

Prosecutor: Because –

McRae: I didn't know who it belonged to; that's correct.

Prosecutor: Because you're well aware, as a police officer, the Fourth Amendment of the Constitution means you can't just take people's stuff, right?

McRae: During Katrina, we did not know who the vehicles belonged to.  We were driving in stolen vehicles that we didn't steal; vehicles that you would basically pull up on the

12

> corner, they would get out and run.  We would not leave a vehicle like that.

> Prosecutor: My question is: You understand the Constitution prohibits police officers from just taking people's stuff? Would you agree?

> McRae: In standard times and standard days, yes, sir, that is correct.

> Prosecutor: Is it you statement that you didn't believe the Constitution applied to you during Hurricane Katrina?

> McRae: No, sir, I didn't say that.

> Prosecutor: So my question is: The Constitution prohibits you from taking people's stuff; isn't that correct?

> McRae: That's correct.

This testimony supports the jury's conclusion that McRae had the requisite willful mental state to support the section 242 conviction.  More to the point, even had the jury been presented evidence that McRae was suffering from PTSD *at the time of the incident* (a claim the record does not unequivocally support, as it mentions only "delayed" PTSD, without discussion about when the disorder would have onset), it is not at all clear that such evidence would have negated the *mens rea* that McRae admitted he had on September 2nd. The district court did not abuse its discretion in denying McRae's motion for a new trial on this ground.

2.

McRae argues that he is entitled to a new trial because Department of Justice attorneys, who were not directly involved in his case, made anonymous postings about his proceedings in the comments section of various NOLA.com articles.[40]  This government-induced pretrial publicity, he argues, requires a

---

[40] In his briefing, McRae focuses mainly on comments made by Sal Perricone, but also mentions, without elaboration, that two other Department of Justice attorneys posted on NOLA.com.

new trial.  These postings were unprofessional, inappropriate, and deserving of our condemnation.  Even so, the district court did not err in denying McRae's motion for a new trial on this basis.

The Rule 33 motion for a new trial "goes to the fairness of the trial rather than to the question of guilt or innocence."[41]  We look to whether the "newly discovered evidence would 'afford reasonable grounds to question . . . the integrity of the verdict,'"[42] a difficult standard to summit.  A defendant must show that there is a "substantial possibility of prejudice arising from" the jury's contact with the newly discovered evidence, in this case the government lawyer-produced statements.[43]  Said differently, McRae must prove a connection between the postings in question and the conduct of his trial, such that we must question our "confidence in the jury verdict."[44]  That condemnable conduct occurred is not enough.

McRae fails to persuade of actual or presumed prejudice.  As an initial note, McRae cannot point to any evidence of actual jury prejudice.  The jury was repeatedly instructed to avoid any media descriptions of the trial.  "A jury

---

[41] *United States* v. *Williams*, 613 F.2d 573, 575 (5th Cir. 1980); *see also United States* v. *Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc) ("Newly discovered evidence need not relate directly to the issue of guilt or innocence to justify a new trial, 'but may be probative of another issue of law.'  For instance . . . questions regarding the fairness or impartiality of a jury [] may be grounds for a new trial.") (quoting *United States* v. *Beasley*, 582 F.2d 337, 339 (5th Cir. 1978)).

[42] *Id.* (quoting *S. Pac. Co.* v. *Francois*, 411 F.2d 778, 780 (5th Cir. 1969)); *see also United States* v. *Poole*, 735 F.3d 269, 278 (5th Cir. 2013) ("[A] new trial is not a mechanism for punishing contempt, by a prosecutor or otherwise, but a way to avoid injustice generally and to avoid a jury verdict for which one has compromised confidence specifically.").

[43] *Williams*, 613 F.2d at 575.; *see also United States* v. *Capo*, 595 F.2d 1086, 1090 (5th Cir. 1979) ("It has long been recognized as a general rule that a defendant, in order to establish a deprivation of due process, must show that potential jurors were actually prejudiced by the pretrial publicity."); *cf. Irvin* v. *Dowd*, 366 U.S. 717, 723 (1961) (stating, in the context of a motion to change venue, that a juror need not be set aside unless the defendant "shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality").

[44] *Poole*, 735 F.3d at 279.

is presumed to follow its instructions,"[45] and McRae offers nothing to suggest that any jury member saw any of Perricone's NOLA.com postings. Without connecting the online comments to the jury, the new evidence does not call into question the integrity of its verdict.

This is not to say that conduct cannot be sufficiently egregious that jury prejudice will be presumed. In *Skilling* v. *United States*,[46] in review of a refusal to grant a change in venue due to negative publicity, the Court gave guidance on when the presumption might apply.[47] It emphasized that "[a] presumption of prejudice . . . attends only the extreme case."[48] Such cases include those where the jury pool was exposed to news stories containing a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight," as well as situations where the community was so small that it would be difficult or impossible to find impartial jurors.[49] On the other side of the divide in *United States* v. *Wilcox*, our court held that the presumption of prejudice does not attach when the defendant's "complaint of pretrial publicity consists of a story from the website of a local news station and a series of 'blog' postings by one individual on a lone website."[50]

This case falls much closer to the *Wilcox* than to the presumptively prejudicial examples highlighted in *Skilling*. Here, the specific government comments discussed by McRae are a small handful out of hundreds of anonymous, speculative postings. He does not put forth any comments which

---

[45] *Weeks* v. *Angelone,* 528 U.S. 225, 234 (2000).

[46] 561 U.S. 358 (2010).

[47] While the motion at issue is different, the focus on whether the publicity is sufficient to require the court to presume prejudice informs our analysis.

[48] *Id.* at 381.

[49] *Id.* at 382.

[50] 631 F.3d 740, 747 (5th Cir. 2011).

No. 14-30995

had "blatantly prejudicial information" akin to a confession, nor was the New Orleans area so small, or the comments so prominent, that they could not have been "shut from sight."[51]

In response, McRae argues that the even if the comments would not normally be presumed to be prejudicial, they should be in this case because they were made by *government lawyers*, albeit not those who were prosecutors on his case. He points to two cases where prosecutorial statements were sufficiently extreme to require a new trial, even absent actual prejudice. These cases trigger a due process-based condemnation of lawyer conduct so egregious as to foul the temple, a blow to the essentials of process so plain as to leave little need to pause to weigh evidentiary inferences for impact upon a verdict given. It is the heavy hand of the court's supervisory power, wielded rarely but then firmly when necessary to secure their very ability to deliver the fair trial promise of due process. They do not persuade. First, in *Henslee* v. *United States*,[52] we ordered a new trial when "the United States Attorney saw fit to file in the office of the Clerk of the District Court a paper denominated 'Motion,'" which contained no substantive legal arguments, only prejudicial information about the defendant, which was "widely publicized both by newspaper and radio."[53] We concluded that "no member of the jury offered the information that he had violated the court's instruction as to the reading of newspaper articles concerning the trial," but nonetheless held that the prosecutor's conduct had so tainted the process that due process required a

---

[51] *Skilling*, 561 U.S. at 382.
[52] 246 F.2d 190 (5th Cir. 1957).
[53] *Id.* at 192.

16

No. 14-30995

new trial.[54]  Second, in *United States* v. *Coast of Maine Lobster Co.*,[55] the First

Circuit exercised its supervisory power to order a new trial when:

> [T]he supervising prosecutor, who was known as such to the jury, made a public statement in the media while the trial was pending; the statement was given even further prominence in the newspaper during the trial and communicated to the majority of the jury; and it singled out for tougher treatment the very species of criminal cases that the jury was being called upon to decide.[56]

The court was careful, however, to confine its rule limiting public comments only "to the statements of a prosecutor who is closely associated with the particular case, either because of his actual participation in it or because he is known by the jury to be an immediate supervisor of it."[57]

Importantly, in both of these cases, the prosecutor in the case at issue, in his capacity as a prosecutor and identified as such, made a public, prejudicial statement about the case that was prominently covered by the local media. Here, by contrast, Perricone was not a member of the case team, and the online comments did not identify him either by name or by position.  Moreover, Perricone's postings were far less prominent than in *Maine Lobster* or *Henslee*; they were one of many in the comments section of internet news articles, below the text of the article itself, rather than highlighted in local newspapers or television broadcasts.[58]  In the face of anonymous, relatively low-profile

---

[54] *Id.* at 193; *see also id.* ("Without in any way imputing an improper motive to the prosecuting officer here, we do find that in the proper conduct of the affairs of his office it should have been apparent that for him to file this motion with the inclusion of the self-serving and irrelevant statements of offenses and crimes not comprehended in the indictment for which Henslee was on trial might well produce the highly unfortunate publicity that actually resulted. His failure to apprehend the natural result of his act is as damaging to the cause of justice as if he had failed in his duty to act with a scrupulous regard for fairness.").

[55] 538 F.2d 899 (1st Cir. 1976).

[56] *Id.* at 902-03.

[57] *Id.* at 902.

[58] *See id.* ("The prominence of the publicity is important because it, more than anything else, affects the likelihood of prejudice to the criminal defendant. An obscure item on the inside pages of a newspaper, it needs hardly be said, is less likely to place pressure on

commentary by lawyers who were not directly prosecuting McRae, we cannot conclude that the district court abused its discretion in refusing to presume prejudice and order a new trial.[59]

### III.

Finally, McRae challenges his within-guidelines sentence on procedural and substantive grounds. Recall that we have already vacated his section 1519 conviction. Our court's practice when one, but not all counts, within a multipart conviction has been vacated has generally been to remand to allow the district court to resentence in the first instance.

> "Sentencing is a fact-sensitive exercise that requires district court judges to consider a wide array of factors when putting together a 'sentencing package.'" When an appellate court vacates one of several related convictions, remand is proper so that the district court can "reconsider the entirety of the (now-changed) circumstances and fashion a sentence that fits the crime and the criminal." . . . The district court may find that a different total sentence would achieve the goals set forth in 18 U.S.C. § 3553 under these new circumstances, or it may not. But the district court should have the opportunity to make this determination in the first instance.[60]

We follow this practice here and remand for resentencing. As we need not, we do not reach McRae's remaining procedural and substantive objections.[61]

---

a jury than a banner headline on the front page. Finally, the nexus between the views as published and the issues in the pending trial must be close enough so that a reasonable person might see an obvious connection. If the views are general or the nexus remote or strained, the potential for prejudice is not realistic.").

[59] *See United States* v. *Poole*, 735 F.3d 269, 279 (5th Cir. 2013) ("Counsel has brought to our attention no case—and we know of none—in which an appellate court affirmed the grant of a Rule 33 motion on grounds of prosecutorial misconduct unrelated to confidence in the jury verdict, merely as a way to punish contemptuous prosecutors.").

[60] *United States* v. *Ekwuruke*, 372 F. App'x 521, 525 (5th Cir. 2010) (quoting *United States* v. *Campbell*, 106 F.3d 64, 68 (5th Cir. 1997)).

[61] *See id.*; *see also United States* v. *Akpan*, 407 F.3d 360, 377 n.62 (5th Cir. 2005).

No. 14-30995

IV.

We AFFIRM the district court's denial of McRae's motion for a new trial. We VACATE McRae's conviction for violating 18 U.S.C. § 1519, and REMAND for resentencing.